# EXHIBIT A

{00115940.1 }

Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 2 of 43

RYAN GESTEN                                      July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                         1

```
 1            UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF FLORIDA
 2

 3   RYAN D. GESTEN,

 4             Plaintiff,

 5   vs.                            CASE NO.
                              0:14-cv-60565-COHN
 6
     PHELAN HALLINAN, PLC, a Florida
 7   limited liability company,

 8             Defendant.
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
 9

10                 DEPOSITION OF

11
                   RYAN GESTEN
12

13      TAKEN ON BEHALF OF THE DEFENDANT

14                 JULY 7, 2014
              2:00 p.m. - 2:45 p.m.
15

16

17          500 East Broward Boulevard
                   Suite 1400
18          Fort Lauderdale, Florida

19

20

21

22

23

24          Laura Leal, Court Reporter

25
```



Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 3 of 43

RYAN GESTEN                                              July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                                    2

```
 1              APPEARANCES OF COUNSEL

 2

 3   On behalf of the Plaintiff:

 4


 5
        SCOTT OWENS, P.A.
 6      SCOTT OWENS, ESQ.
        664 E. Hallandale Beach Boulevard
 7      Hallandale, Florida 33009
        954.589.0588
 8

 9
     On behalf of the Defendant:
10

11      KELLER LANDSBERG, P.A.
        WENDY J. STEIN, ESQ.
12      Suite 1400
        500 East Broward Boulevard
13      Fort Lauderdale, Florida 33394
        954.761.3550
14

15

16

17
     Also Present:
18
        STEPHANIE MICHEL
19      EMILIO LENZI

20

21

22

23

24

25
```



RYAN GESTEN                                             July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                              3

```
 1                INDEX OF EXAMINATION

 2

 3    WITNESS:

 4    Ryan Gesten

 5                                             Page

 6    DIRECT EXAMINATION
      By Ms. Stein                             4
 7

 8

 9

10                  - - -

11

12                INDEX TO EXHIBITS

13
      Defendant's
14     Exhibit          Description          Page

15
        1        Florida Bar Member Search    10
16
        2        Letters                      12
17
        3        Website                      23
18
        4        Property Appraiser's Website 31
19

20
        (Original Exhibits 1-4 have been attached to
21    the original transcript.)

22

23

24

25
```



 1            Deposition of Ryan Gesten
 2                  July 7, 2014
 3
 4   RYAN GESTEN, having been first duly sworn, was
 5   examined and testified as follows:
 6            DIRECT EXAMINATION
 7   BY MS. STEIN:
 8        Q.   Can you please state your name for the
 9   record.
10        A.   Ryan Gesten.
11        Q.   Is your current address 49 Greens
12   Road, No. 9, Hollywood, Florida 33021?
13        A.   No.
14        Q.   What is your current home address?
15        A.   49 Greens Road, Hollywood, Florida
16   33021.
17        Q.   What did I say wrong?
18        A.   No. 9.
19        Q.   Are you at a different number now?
20        A.   No.
21        Q.   Okay.  What?
22        A.   It's just wrong.
23        Q.   Okay.  So there's no number associated
24   with it?
25        A.   There is a legal address that adds a



 1   No. 49 to it, but it's not recognized by the post
 2   office.
 3        Q.   Okay.  Got it.  So is there only one
 4   Greens Road address that --
 5        A.   There is only -- I'm sorry, I didn't
 6   mean to cut you off.
 7        Q.   -- in which you have lived?
 8        A.   There is only one Greens Road address
 9   I've lived at.
10        Q.   Okay.
11        A.   It's 49 Greens Road, No. 49 to the
12   legal, but not to the post office.
13        Q.   And, you know, I probably should have
14   said this before, as you know, I represent Phelan
15   Hallinan.  And if there's any question I ask, if
16   you have any lack of clarity, just let me know so
17   that I can clarify that for you.
18        A.   Okay.
19        Q.   And then, also, I don't know, have you
20   ever had your deposition taken before?
21        A.   I don't think so.
22        Q.   Well, very basic rule that will keep
23   us in both good favor with the court reporter, we
24   just have to make sure not to speak over each
25   other.  Understood?



```
 1        A.   Absolutely.

 2        Q.   It's easier said than done, though.

 3        A.    It is.  I'm better at giving the

 4   instructions than taking them.

 5        Q.   As is everybody.  You know, what is

 6   it?  The cobbler's kids go barefoot?  Okay.

 7   Let's start this again.  So you currently reside

 8   at 49 Greens Road, Hollywood, Florida, correct?

 9        A.   Yes, ma'am.

10        Q.   How long have you lived there?

11        A.   I believe I moved in in 2007, probably

12   July.

13        Q.   And is that when you initially

14   purchased the property or did you move in

15   sometime after?

16        A.   When I purchased it.

17        Q.   And when you purchased that property,

18   did you give a mortgage to a lender?

19        A.   Yes.

20        Q.   And who was that lender?

21        A.   I believe it was Wells Fargo.

22   Although, I believe I found out after that it was

23   not.  It was Fannie Mae.

24        Q.   Okay.  As we sit here today, is there

25   still a mortgage on your property?
```



1          A.    I don't know.  It's a good question.

2    It's a legal conclusion.  We'll find out.

3          Q.    Okay.  So it is my understanding that

4    there is currently an action between you and the

5    lender.

6          A.    That's correct.

7          Q.    Okay.  That is clearly not this case,

8    but, as of now, you're telling me there's an

9    issue as to whether or not that mortgage exists

10   on the property?

11         A.    There's - well, I believe there is a

12   legal argument that the mortgage is no longer

13   valid due to some actions of Wells Fargo.

14         Q.    Okay.

15         A.    But I have separate counsel for that

16   case who would be more well-versed in that than

17   I.

18         Q.    Who's your counsel in that case?

19         A.    Andy Tarr, Andrew Tarr, T-A-R-R.

20         Q.    How much was that mortgage when it was

21   first put on the property?

22         A.    That's a good question.  I'm guessing

23   it was 372, whatever made it conforming just

24   under - so whatever that number was at the time,

25   whether it was 372 or 373, something like that.



```
 1        Q.   Do you remember having correspondence
 2   at any point before today with the lender
 3   regarding anything, about application of payments
 4   or any other conversations directly with the
 5   lender?
 6        A.   Just to be clear, when you say "the
 7   lender," are you talking about Wells Fargo or,
 8   ultimately, the owner?
 9        Q.   With Wells Fargo.
10        A.   Okay.
11        Q.   Let's start with Wells Fargo.
12        A.   Okay.  There's been numerous
13   correspondence with Wells Fargo regarding
14   numerous issues on the mortgage going back to - I
15   think this all started at the end of 2009, if I
16   recall correctly.
17        Q.   And when you say "this all started,"
18   issues as to whether or not the mortgage was done
19   correctly by Wells Fargo?
20        A.   I'm not - I haven't addressed the
21   issue specifically if the mortgage was rendered
22   properly.  I believe there was a problem with the
23   servicing of it thereafter.  My belief is that
24   Wells Fargo violated numerous federal statutes in
25   failing to properly administer the mortgage,
```



```
 1   accept a HAMP, accept a HAMP 2.0, and accept the
 2   HAFA, all that were applied for.
 3        Q.   I'm sorry, what is HAMP?
 4        A.   HAMP?
 5        Q.   What is HAMP?
 6        A.   HAMP, Home Affordability - Home
 7   Affordability Modification Program.
 8        Q.   What was it?  HAFA?
 9        A.   HAFA is Home -- I don't know.
10        Q.   Okay.
11        A.   I don't know what it stands for.  It's
12   a federal program.  One of them deals with short
13   sales and one of them deals with loan
14   modifications.
15        Q.   Okay.  And in those conversations in
16   approximately September 2011, did you request
17   that Wells Fargo send communications to you at
18   6974 Griffin Road in Davie, Florida?
19        A.   I don't specifically recall that, but
20   it could be possible as that used to be my office
21   address for my law firm.
22        Q.   Okay.
23        A.   But I don't specifically recall that.
24        Q.   When you say "your law firm," so
25   you're an attorney?
```

Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 11 of 43

RYAN GESTEN                                              July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                                    10

```
 1            A.   I am, licensed with the Florida Bar.

 2                 MR. OWENS:  So you say.

 3                 THE WITNESS:  Easily checked.

 4                 (Defendant's Exhibit 1 was marked for

 5            identification.)

 6    BY MS. STEIN:

 7            Q.   Lucky for you, I did.

 8            A.   I'm sure you have.

 9            Q.   Okay.  I'm going to hand this to your

10    attorney first to take a look at it and then when

11    he's done - actually, you know what?  I do have

12    an extra copy for you as well.

13            A.   Is that me?

14            Q.   I'm not sure that it is because the

15    picture -- Is that you in the goatee in the

16    picture?

17            A.   That is.

18            Q.   Okay.  And is this a --

19            A.   This picture is very old.

20            Q.   Is this, as far as you know, a true

21    and correct copy of your member information as

22    held by the Florida Bar website?

23            A.   I'll be honest, I have not looked at

24    it in a while, but it does look proper.  It's the

25    right bar number, right address, right name.
```



Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 12 of 43

RYAN GESTEN                                              July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                               11

1          Q.    Now, as far as the practice areas, or,

2    actually, everything below ten-year discipline

3    history, would you agree with me that all that

4    information is information that you add to the

5    Florida Bar, that you add to your Florida Bar

6    profile?

7          A.    Sure.  Yes.

8          Q.    Okay.  So with respect to University

9    of Miami School of Law, that's not something that

10   the Florida Bar automatically puts on the

11   website.  At some point in time you edited your

12   profile to add University of Miami School of Law?

13         A.    Well, the reason that I wasn't 100

14   percent confident is I'm not sure whether - just

15   semantics, maybe, but I'm not sure whether I went

16   on to the website and changed this information or

17   is it something from the questionnaire that they

18   send you yearly for your renewal.  I just don't

19   recall, but I am sure that this is something that

20   I selected one way or another.

21         Q.    Okay.  So is all of this information,

22   the website address, the firm size, et cetera,

23   this is all information given by you to the

24   Florida Bar to be included as part of your

25   profile?



1          A.   I'd agree with that, yes.

2          Q.   And that includes all of the practice

3     areas listed as well?  That's not something that

4     the Florida Bar provides for any attorney,

5     correct?

6          A.   Correct.

7               (Defendant's Exhibit 2 was marked for

8          identification.)

9     BY MS. STEIN:

10         Q.   Let's turn to the lawsuit that you

11    brought against my client.  I'm going to go ahead

12    and hand you what has been marked as Exhibit 2.

13    And what I'm going to do because it's four pages,

14    I'm going to label them 1, 2, 3 and 4 to make it

15    easy for reference.  And I have an extra copy for

16    your attorney.

17              So you have sued Phelan Hallinan

18    based upon the letters that I have handed to you,

19    which have been marked as Exhibit 2; am I

20    correct?

21         A.   Yes.

22         Q.   And can you please tell me?

23         A.   Well --

24         Q.   Oh, please, take your time.

25         A.   Well, there were four letters sent to



Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 14 of 43

RYAN GESTEN                                          July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                              13

```
 1   me and only two of them are included in this

 2   exhibit.

 3        Q.   So are you suing for four letters or

 4   based on these two letters?

 5        A.   I would need to review the lawsuit to

 6   see whether all four letters are included or not.

 7            MR. OWENS:  I'll stipulate we're suing

 8        for these two letters.

 9            THE WITNESS:  Okay.

10   BY MS. STEIN:

11        Q.   Okay.

12        A.   I guess it's just these two letters.

13        Q.   Okay.  So looking at the two letters,

14   and the letters themselves are at Nos. 1 and 3,

15   correct?

16        A.   Yes, ma'am.

17        Q.   When did you receive these letters?

18        A.   I believe it was shortly after the

19   date here, which is February 21, 2014, but I

20   could not tell you off the top of my head my

21   exact date.  Of course, I do have records in my

22   office.  If you wish to know the exact date, I'd

23   be happy to provide that at a later time.

24        Q.   Did you receive these on different

25   dates?
```



```
 1          A.   Yes.

 2          Q.   And how do you know they were on

 3   different dates that you received them?

 4          A.   Because I remember receiving it at

 5   home first and then receiving it in the office, I

 6   believe, a day later.

 7          Q.   Let's take a look at 1.

 8           Well, as long as we're talking about the

 9   two letters, when you looked at the two letters,

10   did you compare them to see if there were any

11   differences?

12          A.   Yes, I did, actually.

13          Q.   And what did you come to the

14   conclusion when you did that?

15          A.   The only difference that I noticed was

16   that the address was different.

17          Q.   So it's an identical letter sent to

18   two different addresses, correct?

19          A.   Yes.  Well - yes, that's fine.

20          Q.   Okay.  With respect to the middle

21   portion of Page 1 of Exhibit 2, it states, "The

22   amount of the debt as of 1/13/2014 is as

23   follows."  And then it shows a total amount of

24   $480,116.98; is that correct?

25          A.   Yes.
```



1        Q.   And just below that it says, "Interest

2   and other items will continue to accrue," is that

3   correct?

4        A.   Yes.

5        Q.   As we sit here today, is the amount of

6   $480,116.98 the incorrect debt claimed by Wells

7   Fargo as of January 13, 2014?

8        A.   I don't know.  I have been seeking a

9   proper accounting of the balance for a long time.

10  I've never really received it.  The statements

11  they send me do not correspond.  They really

12  don't make any sense to me.  I have tried to

13  contact Wells Fargo numerous times both before

14  and after this letter, and to this date I am

15  still unable to get an actual balance.

16       Q.   Okay.  When you received this letter,

17  though, were you under the impression that the

18  480,000 was due as of the date of the letter?

19  Let me say this, what Wells Fargo believes is

20  due, because, obviously, you take issue with

21  whether there's an amount owed because you have a

22  difference of opinion as to the mortgage, and I

23  understand that.

24       A.   Okay.  There's also a second -- I

25  don't mean to cut you off.



1          Q.    No, please, please.

2          A.    There also is a second issue.  Wells

3    Fargo has maintained that they are the creditor

4    from day one and it is in public records from

5    Fannie Mae that they are not.  At some point this

6    loan was transferred and may have been

7    transferred back, and that's one of the things

8    I'm still trying to figure out.  So as I sit here

9    today, other then this letter, I'm not sure that

10   Wells Fargo is the lender and not just a

11   servicer.

12         Q.    Okay.

13         A.    Okay?  I don't know what's owed or to

14   who.

15         Q.    So let's call it mortgagee, how about

16   that?

17         A.    Fine.

18         Q.    Whoever that might be.

19         A.    Fine, whoever that might be.

20         Q.    So let's say the mortgagee, do you

21   understand from this letter that the mortgagee

22   believed that the debt owed to it as of January

23   13, 2014 was the 480,000?

24         A.    I understand that the letter states

25   that that's the amount due as of January 13,



Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 18 of 43

RYAN GESTEN                                           July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                              17

```
 1   2014.  Is that the question?

 2         Q.   Yes.

 3         A.   Okay.

 4         Q.   And that you do understand you're also

 5   informed in this letter that interest and other

 6   items will continue to accrue, correct?

 7         A.   The letter does say that, yes.

 8         Q.   Okay.  So have you ever had a letter

 9   take more than a day to get to you?

10         A.   Of course.

11         Q.   More than two days?

12         A.   Yes.

13         Q.   So even if Phelan Hallinan had sent a

14   letter on January 13, 2014 and said that as of

15   the date of this letter the amount due is 480, by

16   the time you received the letter, aren't you

17   informed that interest and other items will

18   continue to accrue so that the amount that the

19   mortgagee is seeking is actually higher than the

20   480?

21         A.   I'm sorry, you lost me.  You are going

22   to have to ask me that again.

23         Q.   Okay.

24         A.   I'll --

25         Q.   It's rare that our post office ever
```



1  delivers on the same day you mail a letter,

2  correct?

3         A.   Of course.

4         Q.   So let me break it down.  Let me break

5  it down.  So the mortgagee sends the letter to

6  you, let's say, on January 13, 2014.

7         A.   Right.

8         Q.   Follow me?

9         A.   Yes.

10        Q.   And it says as of the date of this

11  letter, $480,000.00 is due.  Still with me?

12        A.   Yes.

13        Q.   And you are still informed that

14  interest and other items will continue to accrue,

15  correct?

16        A.   Correct.

17        Q.   So you know that because you received

18  the letter sometime after January 13, 2014, that

19  $480,116.98 number is no longer the number that

20  the mortgagee believes is due, correct?

21        A.   Okay.  I mean, the problem is that I

22  don't really see it that way.  I understand what

23  you're saying.  I mean, it's possible.

24        Q.   So --

25        A.   I wouldn't know what they believe is



Case 0:14-cv-60565-JIC  Document 21-1  Entered on FLSD Docket 08/08/2014  Page 20 of 43

RYAN GESTEN                                    July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                          19

```
 1   due.
 2         Q.   But to the extent that if you get a
 3   letter that says as of the date that a debt is
 4   due, but you don't get that letter for several
 5   days because of the post office --
 6         A.   Right.
 7         Q.   -- it takes days to get to you, would
 8   you expect that number to be different based on
 9   being told that interest and other items will
10   continue to accrue?
11         A.   See, here's the problem, are you
12   talking about in this specific instance or
13   generally?
14         Q.   Let's talk about general first.
15         A.   Okay.  Generally, I understand that a
16   letter is obviously received days after it's
17   mailed and whatever number is in the letter is no
18   longer the number.  Okay?  Specifically as to
19   this matter, I don't believe that these amounts
20   are correct.  I don't believe Wells Fargo has
21   been tracking the numbers correctly and I don't
22   believe that no matter what date they sent the
23   letter would be correct, because the other
24   letters they've sent me don't match these.  Okay?
25         As far as this letter specifically, as I'm
```



Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 21 of 43

RYAN GESTEN                                                July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                                      20

1    sure you know based on my background, I have sent
2    demand letters before in my life, and my letters
3    don't look anything like this.  My letters state,
4    "As of the date of this letter, this is the
5    balance due."  So this letter to me is confusing
6    in that it's saying this is the date it said
7    this is the amount due as of a specific date, not
8    as of the date of the letter.
9          Q.   So you were confused when you received
10   this.  You didn't understand the 480,000 to be
11   due as of January 13, 2014.  You understood it as
12   the date due as of February 21, 2014?
13         A.   I believe it to be one and the same.
14         Q.   So --
15         A.   Based on this letter, I believe that
16   the amount due on January 13, 2014 is the same as
17   the amount due on February 21, 2014, which,
18   obviously, would be different when I received the
19   letter days later.
20         Q.   So even though it states as of January
21   13, 2014 this is the amount that we're seeking,
22   you are interpreting that as meaning that is the
23   date of the letter?
24         A.   No.  I'm interpreting that my belief
25   of the law is that the amount in the letter had



 1  to be correct as of the date it was mailed.

 2        Q.   And when you say your belief, so

 3  you've actually litigated FDCPA cases in federal

 4  court, correct?

 5        A.   I am currently litigating - defending

 6  a FDCPA case in court.

 7        Q.   And as counsel, not as a defendant?

 8        A.   As counsel, not as a defendant,

 9  correct.

10        Q.   So you do have experience with FDCPA

11  in your practice as an attorney?

12        A.   Actually, I have a lot of experience

13  with FDCPA in my practice.

14        Q.   Can you please tell me about your

15  experience?

16        A.   Sure.  I started practicing law in

17  2000.  My first job was with Sprechman &

18  Associates, who is a collection law firm.  They

19  did consumer collections and I was expected to

20  know the FDCPA back then and not violate it.

21        Q.   Were you an associate or were you a

22  shareholder at that firm?

23        A.   Associate.  I've never been a

24  shareholder in any firm but my own.

25        Q.   Who did you report to at that firm?



```
 1        A.    That's interesting.  My direct
 2   supervisor was Scott Modlin.  I believe it's
 3   M-O-D-L-I-N, but everybody reported to Steve
 4   Sprechman in the end.
 5        Q.    Can you please spell that last name?
 6        A.    S-P-R-E-C-H-M-A-N.
 7             MR. OWENS:  Or, as I like to call him,
 8        Defendant.
 9             THE WITNESS:  Not while I was there.
10   BY MS. STEIN:
11        Q.    So when you said that you were
12   expected to know it, did you have trainings in
13   FDCPA?
14        A.    Yeah, I think we did.  I have
15   definitely attended a seminar in the FDCPA.  I
16   don't remember if it was at Sprechman's office or
17   not.  I was only there for one year, so I don't
18   recall.  I mean, I can go back and look, but I
19   don't recall when I took the training class.
20        Q.    Okay.  So even in light of your FDCPA
21   training, when you received this letter, you did
22   not understand that the debt that they were
23   seeking was as of January 13th rather than
24   February 21, 2014?
25        A.    It's not exactly what I said.  What I
```



Case 0:14-cv-60565-JIC  Document 21-1  Entered on FLSD Docket 08/08/2014  Page 24 of 43

RYAN GESTEN                                          July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                              23

1  believe is that the amount due as of January

2  13th, would be the same that would be the amount

3  due on February 21st.

4       Q.   And why is that?

5       A.   Based on the way the letter is written

6  and what I have been taught on how letters should

7  be written.

8       Q.   So it's based on your understanding of

9  FDCPA of how it should have been written?

10       A.   Right.

11       Q.   Okay.  And speaking of your

12  experience --

13            MR. OWENS:  I hope she doesn't get

14       your Facebook.

15            THE WITNESS:  I'm sure we will.

16            MS. STEIN:  Done.

17            (Defendant's Exhibit 3 was marked for

18       identification.)

19  BY MS. STEIN:

20       Q.   I'm handing you what's been marked as

21  Exhibit 3.  Can you please tell me, other than,

22  obviously, where it says "New Tab" on top, is

23  that a true and correct copy of your website for

24  your law firm?

25       A.   I believe it is.



1       Q.   Your law firm being the Law Offices of

2   Ryan D. Gesten P.A.?

3       A.   Yes, ma'am.

4       Q.   And the Page 2 of this exhibit, that

5   is the consumer rights portion of the page,

6   correct?

7       A.   It is.

8       Q.   And on this page, you inform the

9   public that, "If you have any questions about

10  your rights as a consumer, Ryan D. Gesten,

11  Esquire, is available to help you.  He has a

12  thorough understanding of the applicable

13  consumers rights laws and regulations in this

14  state," is that correct?

15      A.   Yes.

16      Q.   So I read it correctly, yes?

17      A.   Yes, you read it correctly.

18      Q.   And it is correct, that is, you're not

19  making any misrepresentation to the public, that

20  is true?

21      A.   Absolutely not.  Yes, it is true.  I'm

22  not making a misrepresentation.

23      Q.   Okay.  And you would expect to --

24      A.   What's the triple negative?  Where are

25  we at?



Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 26 of 43

RYAN GESTEN                                                July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                                    25

```
 1              MR. OWENS:  When did you stop beating
 2        your wife?
 3   BY MS. STEIN:
 4        Q.   And, also, looking at this page, "Ryan
 5   D. Gesten, Esquire, is knowledgeable and can
 6   asset you" -- I'm assuming that meant to say
 7   "assist" -- "can asset you with claims arising
 8   from creditors and/or their agets" -- I'm
 9   assuming there was supposed to be an N --
10   "violations --
11        A.   Oh, wow, look at that.
12        Q.   -- of state and federal statutes,
13   including" -- and the very first statute is
14   FDCPA.
15        A.   FDCPA, yes, ma'am.
16        Q.   Okay.
17        A.   I need a proofreader.
18        Q.   I'm for hire after this case?
19        A.   I hope not.
20        Q.   And all of the representations you
21   made on your website as an attorney are true and
22   correct?
23        A.   Absolutely.  Although, I do not
24   believe I've taken a consumer rights case in
25   quite some time.  The website has not been
```



Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 27 of 43

RYAN GESTEN                                                    July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                                          26

```
 1    undated in a few years.
 2         Q.   But, actually, you just said you are
 3    currently litigating an FDCP case.
 4         A.   Defense.
 5         Q.   On the defense side?
 6              MR. OWENS:  Your side.
 7              THE WITNESS:  Your side.
 8    BY MS. STEIN:
 9         Q.   My side?
10         A.   Your side.
11         Q.   So who you are defending?
12         A.   I am defending a company called GQ
13    Holdings, I think, LLC.
14         Q.   And in that case is there a case of
15    multiple letters being sent?
16         A.   I don't think so.  To be honest, it's
17    a pro se plaintiff.  I'm not quite sure what
18    she's suing for yet as the complaint doesn't
19    really make sense.  We filed a motion to dismiss.
20    She sought leave to amend.  She's filed an
21    amended complaint that does not fix any of the
22    issues that were raised on the motion to dismiss.
23         Q.   But that's not your first time
24    litigating in federal court an FDCPA action, is
25    it?
```



1        A.    It may be.

2        Q.    Have you ever litigated against Donald

3    Yarbrough?

4        A.    Oh, I did defend one case against

5    Donald Yarbrough.  Yes, you are correct.  Your

6    memory is better than mine.

7        Q.    Okay.

8        A.    That was when I was employed by Behar,

9    Gutt & Glazer.  Donald Yarbrough, I believe, sued

10   one of my collection agency clients at the time

11   for a personal matter, and I believe it was

12   resolved.

13       Q.    So with your training you have had at

14   least two cases where you have defended FDCPA

15   actions, correct?

16       A.    I've had many more.  Federal court,

17   two cases federal court.

18       Q.    Okay.

19       A.    I've had state court cases.

20       Q.    Approximately how many?

21       A.    At one period of time I was in-house

22   counsel for a national collection agency called

23   Hudson & Keyse.  It's since out of business.

24   When they hired me, one of my jobs was to resolve

25   all their FDCPA cases that were pending, which I



1    think was three, if I recall correctly.

2         Q.    When you received these letters, and

3    I'm referring to Exhibit 2, from Phelan Hallinan,

4    did you calendar 30 days in order to send a

5    request for a validation of the debt?

6         A.    I did not.

7         Q.    Okay.

8         A.    But that - but I cannot tell you

9    whether my office did or did not.

10        Q.    Okay.

11        A.    I would have to look.

12        Q.    When you say your office, I take it

13   you have support staff at your office?

14        A.    I have support staff at my office.

15        Q.    Who do you work with at your office?

16        A.    I have one attorney who is a

17   non-equity partner, David Vogel.  I have a legal

18   assistant named Lindsey Carroli.  I have a

19   part-time paralegal, Teresa Figueroa.  And my

20   father helps me out from time to time.

21        Q.    Is your father also an attorney?

22        A.    My father is an attorney, but not

23   licensed in Florida.  He never took the Florida

24   Bar.

25        Q.    Okay.



1        A.   He was licensed in New York.  I
2  believe it lapsed.  He doesn't provide any kind
3  of legal work.  It's more helping me with
4  accounting.
5        Q.   Okay.  And when you received these
6  letters, did you actually ask for a debt
7  validation from Phelan Hallinan?
8        A.   I don't believe I did, but I do
9  believe I caused Andy Tarr to.
10       Q.   And was there ever a response from
11 Phelan Hallinan saying your request for debt
12 validation is too late?
13       A.   Not that I have seen.
14       Q.   Okay.
15       A.   Was that mailed to me?
16       Q.   Oh, no, you were absolutely timely.
17 They took no issue.
18       A.   Oh, okay.
19       Q.   Don't you worry.
20       A.   Okay.
21       Q.   I just want to know if you were ever
22 told that it was too late?
23       A.   No.
24       Q.   So, as far as you know, it was
25 accepted as timely?



1          A.    But - yes, but I have other - well,

2    we'll get to it.   That's fine.

3          Q.    Let me guess here, you have issues

4    with how they responded substantively?

5          A.    No.

6          Q.    Okay.

7          A.    The issue is the second letter that

8    you - that was sent to me at both addresses

9    telling me to contact Wells Fargo directly.   At

10   the same time that that occurred, Wells Fargo did

11   call my office to speak with me.   I don't

12   remember the individual.   I spoke with that

13   individual.   He told me I had to speak to a

14   different department.   When I called that

15   department, they won't speak with me.   When I

16   called the number on the other letter that came

17   with this one, they won't speak to me either.

18   I've asked Andy Tarr to talk to them about

19   getting a loan modification package or trying to

20   get them to speak with me so I can deal with it

21   myself.   And my attorney has advised me that as

22   of this date, he can't get that package either.

23         Q.    I don't want to know what your

24   attorney told you.

25         A.    That's okay.



1          Q.    Don't waive attorney/client privilege

2     with me.

3          A.    That issue is fine.

4          Q.    Okay.

5          A.    So that's the problem I have as far as

6     correspondence right now.

7          Q.    But as far as this action and as far

8     as your counsel has told us, what you are suing

9     Phelan Hallinan for are the two letters attached

10    as Exhibit 2?

11         A.    Correct.

12         Q.    And I'll make the representations that

13    these are the only letters that are actually

14    attached to the complaint that you filed against

15    Phelan Hallinan.

16          When you received the letter at home at

17    the Hollywood address versus the Davie address,

18    when you received the letter at home, did you

19    calendar the 30 days due date at that point on

20    some home calendar?

21         A.    No.

22              (Defendant's Exhibit 4 was marked for

23          identification.)

24    BY MS. STEIN:

25         Q.    I'm going to hand you what's been



```
 1   marked as Exhibit 4.  And as far as you know, is

 2   this a true and correct copy of the property

 3   appraiser website for your home address?

 4        A.   I have not looked mine up, so I could

 5   not tell you if this is correct or not, but based

 6   on reviews of public records that I do, I mean,

 7   this looks like it's right.

 8        Q.   And when you were saying earlier that

 9   the state has you at a different address, but

10   that the post office won't actually deliver it to

11   you, is this what you are referring to when it

12   says, "Site address:  Greens Road 49 Hollywood"?

13        A.   Correct.

14        Q.   And the mailing address on this is 49

15   Greens Road, Hollywood?

16        A.   Correct.

17        Q.   Okay.  So let's assume, I know you

18   don't remember, but let's assume for a moment

19   that you did have a conversation with a mortgagee

20   that correspondence is to be sent at your Griffin

21   Road address and you tell the property appraiser

22   that mail related to your address goes to Greens

23   Road.  So do you take issue with letters going to

24   both addresses to make sure you get the letter?

25        A.   Yes.
```



```
 1        Q.   Why is that?

 2        A.   I believe that the letter that I sent

 3   Wells Fargo was advising them that Ryan D. Gesten

 4   was represented by Ryan D. Gesten P.A., who was -

 5   and Ryan D. Gesten was a consumer and all mail

 6   must be directed to my office as counsel for me.

 7        Q.   So your issue is that no

 8   correspondence should have ever gone to your

 9   home, even though that is the subject of the

10   mortgage that is at issue, you should not have

11   received any correspondence from Phelan Hallinan

12   at your home?

13        A.   That is one of the issues.  I wouldn't

14   say that is the issue.

15        Q.   Okay.  I'm trying to understand here

16   because this is the only day I get to speak with

17   you before trial, as you know.

18        A.   I'll talk to you any time you want.

19        Q.   Well, I don't want to have to pay

20   Scott for his time, so, no, this is it.

21             MR. OWENS:  I may be on the hook

22        already.

23   BY MS. STEIN:

24        Q.   So we've already established that you

25   sat and looked at the two letters.  You
```



```
 1   determined it's the same letter sent to each
 2   address, correct?
 3          A.    I believe it is, yes.
 4          Q.    So --
 5          A.    Do you want me to -- I know this is a
 6   little backwards and I apologize.
 7          Q.    Please explain.
 8          A.    If you want me to speak generally
 9   about what my issue is, that's fine.
10          Q.    Please do.
11          A.    Okay.  The problem relates back to
12   Wells Fargo, I believe, not Fannie Mae.  It's the
13   same issue I have been having with them from the
14   beginning.  Okay?  Their departments don't speak
15   to each other.  They have no idea what is going
16   on.  I believe the same thing happened when it
17   was forwarded to the law firm, and I don't want
18   to butcher their name, so I'm not going to say
19   it.
20           They will call me both on my cell phone at
21   work or at home at all times, even though there
22   was a cease and desist not to do so.  When I
23   tried to call them back, they won't take my
24   calls.  When I write them a letter, they tell me
25   they won't talk to me.  I have to go somewhere
```



Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 36 of 43

RYAN GESTEN                                                July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                                      35

```
 1   else.  I've never been able to communicate with
 2   them properly.  My position is that either you
 3   accept the cease and desist and you only deal
 4   with me at work under my name or you reject the
 5   cease and desist and you take my calls, one or
 6   the other.
 7        If I was to pick up the phone right now
 8   and call Wells Fargo, they'd tell me that they
 9   can't speak to me because I'm represented by
10   counsel, even though I'm a lawyer and my letter
11   tells them that I'm a lawyer and my counsel's
12   letter tells them that they're allowed to speak
13   with me directly.
14        Q.   So --
15        A.   I think they're trying to ride the
16   fence and that's my problem.
17        Q.   So at the time of this letter --
18        A.   And --
19        Q.   -- the February 21, 2014 letter, were
20   you still representing yourself or was Mr. Tarr
21   representing you?
22        A.   At the time of the letter, I was not
23   represented by Mr. Tarr yet in this matter.
24        Q.   So, technically, even though one is
25   your home and one is your office, both letters
```



```
 1   were directed to you and nobody else, correct?
 2        A.   Correct, which is - would be improper
 3   in both instances.  The letter to my home should
 4   not have been sent to my home as I was
 5   represented by my law firm and they were under a
 6   cease and desist order to only send it to my
 7   office.  The letter to the office is improper and
 8   that is to me directly instead of to my firm.
 9        Q.   Okay.  So they should have never sent
10   this letter to your home?  That is what you are
11   saying?
12        A.   Correct, I don't believe this letter
13   should have been sent to my home unless they
14   agree there isn't a cease and desist.
15        Q.   Have you filed any suit against the
16   mortgagee because of these alleged violations?
17        A.   No.  The state court action is not at
18   that stage yet.
19        Q.   When you say "the state court action,"
20   are you --
21        A.   The foreclosure action.
22        Q.   Foreclosure action?
23        A.   The foreclosure action has not gone -
24   we're still at the motion-to-dismiss stage.
25        Q.   Is it also your contention that with
```



Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 38 of 43

RYAN GESTEN                                          July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                              37

```
 1   the foreclosure lawsuit, should you not have been
 2   served at your home, only at your office?
 3        A.   The law allows them to serve me at my
 4   house if they wish.
 5        Q.   Okay.
 6        A.   So you were asking legally, right?
 7   Legally should they be allowed to?
 8        Q.   I was asking legally.
 9        A.   Okay.
10        Q.   And you're a man who clearly knows
11   what he's talking about, so, yes.
12        A.   Well, I - you know, I used to
13   represent student lenders, lending companies for
14   lawyers.  And I think I just take a different
15   path maybe than most other lawyers, because I
16   would not have served somebody at home given the
17   choice.  I mean, they know I'm a lawyer.  I'm
18   sitting at my desk 9 to 5, at least, every day
19   Monday through Friday.  I accept service from
20   anybody that wants to serve me.  I don't want to
21   avoid.
22        Q.   When you say, "they knew" --
23        A.   Wells Fargo knew.
24        Q.   --  Wells Fargo knew because you told
25   Wells Fargo, correct?
```



1        A.    It's on my application, absolutely,

2    and it's on all the correspondence between me and

3    them prior to them hiring Phelan Hallinan.  Say

4    it.

5        Q.    It will look just fine on the

6    transcript.

7        A.    Phelan Hallinan.

8        Q.    So did you ever tell Phelan Hallinan

9    directly, and, again, I'm talking before the

10   February 21st letter, you never told Phelan

11   Hallinan that you were represented by counsel?

12       A.    Never heard from them.  First time I

13   ever heard from them regarding this matter was

14   the letter I received at my home.

15       Q.    When you say you never heard from

16   them, and you never reached out to them?  You had

17   no idea that they would be representing the

18   mortgagee before you received this letter,

19   correct?

20       A.    Correct, I didn't know them.

21       Q.    I'm just going to take a minute with

22   my client and I think we'll be able to rap it up.

23       A.    Okay.

24           (Whereupon, there was a brief recess.)

25   BY MS. STEIN:



1       Q.   I just want to clarify one point with

2   you.  When you said you know that you received

3   the letters at different dates, you received it

4   at your home one day.  Did you receive it at your

5   office the next day?  How do you know you

6   received the letters on different days?

7       A.   Because my wife got the letter at home

8   first and I'd never seen it before.  And I came

9   home from work and she said, "What is this?"  So

10  I knew I'd never seen it before.  For some reason

11  I think it was a Friday.  And when I got back to

12  the office on Monday, in Monday's mail I received

13  a letter at work, but I don't know exactly.

14      Q.   When --

15      A.   I would have to check.

16      Q.   When you received that letter, did you

17  immediately come home or did you wait until the

18  end - like was there any --

19      A.   No, I got home.

20      Q.   Okay.

21      A.   I got home and my wife said, "What's

22  this?"

23      Q.   So you were already at the end of the

24  business day at that point?

25      A.   Yes, correct.



1          Q.    I have no further questions.

2          A.    And we do check our mail every day at

3    work.

4          Q.    No further questions.

5                MR. OWENS:   We'll waive, and I guess

6          we'll order.

7                MS. STEIN:   As will we.

8             (Deposition concluded at 2:45 p.m.)

9           (Reading and signing of the deposition by

10   the witness has been waived.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 0:14-cv-60565-JIC   Document 21-1   Entered on FLSD Docket 08/08/2014   Page 42 of 43

RYAN GESTEN                                          July 07, 2014
GESTEN vs. PHELAN HALLINAN, PLC                              41

```
 1                  CERTIFICATE OF OATH

 2

 3

 4

 5   STATE OF FLORIDA

 6   COUNTY OF BROWARD

 7

 8

 9        I, the undersigned authority, certify

10   that RYAN GESTEN personally appeared before me

11   and was duly sworn.

12

13        WITNESS my hand and official seal this

14   7th day of July, 2014.

15

16

17

18

19

20               Laura Leal

21               Notary Public - State of Florida

22               My Commission No. EE 222822

23               Expires:  November 17, 2016

24

25
```



```
 1                CERTIFICATE OF REPORTER

 2

 3

 4

 5   STATE OF FLORIDA

 6   COUNTY OF BROWARD

 7

 8        I, LAURA LEAL, Shorthand Reporter, certify

 9   that I was authorized to and did stenographically

10   report the deposition of RYAN GESTEN; that a

11   review of the transcript was not requested; and

12   that the transcript is a true and complete record

13   of my stenographic notes.

14        I further certify that I am not a

15   relative, employee, attorney, or counsel of any

16   of the parties, nor am I a relative or employee

17   of any of the parties' attorney or counsel

18   connected with the action, nor am I financially

19   interested in the action.

20        Dated this 17th day of July, 2014.

21

22        _____

23        Laura Leal, Court Reporter.

24

25
```

